**(117 So. 777)**

No. 28148.

### Succession of WALSH.

June 4, 1928.  Rehearing Denied July 2, 1928.

Merrick, Schwarz Guste, Barnett & Redmann and William J. Guste, all of New Orleans, for appellant Walsh.

James Barkley Rosser, Jr., of New Orleans, for appellants White heirs.

Loys Charbonnet, of New Orleans, for appellees.

THOMPSON, J.  This is a demand instituted in the above-styled succession proceeding to have declared null and void an instrument probated as the olographic last will and testament of Mrs. Margaret O'Brien Walsh.

The will was dated April 16, 1924, the testatrix died January 27, 1925, and the will was admitted to probate February 2, 1925.

The Misses Kate and Mary E. O'Brien were named as universal legatees and appointed executors, with seizin and without bond.  The legatees were second cousins of the testatrix, though they were referred to in the will as her nieces.

The decedent left no forced heirs, but she was survived by her husband, residing in this city.

The first attack made on the will was by the husband, who alleged that the will was not entirely written, dated, and signed by the hand of his wife; that he is informed and believes that one Hugh O'Brien held the hand of his said wife during the writing of the will, and that she did not, unassisted, write said will; that his said wife was and had been suffering with cataract of the eyes, and was blind, or partially blind, and not physically able to have written said will; that his said wife was suffering, and had been suffering, with Bright's disease in its malignant stages; that she had suffered a stroke of paralysis, and by reason thereof, her mind had become so mentally deranged that at the time of the making of said alleged will she

had not the mental capacity to have made a will.

Several months after the petition had been put at issue by answer of the Misses O'Brien, a number of individuals, alleging themselves to be nieces and nephews, some residing in New York, some in Texas, and some in Mexico City, Mexico, appeared and intervened in the proceeding, joining the husband in his attack upon the will.

In addition to the causes of nullity alleged by the husband, these interveners alleged that Mrs. Walsh was totally illiterate, being unable to even read or write, except to sign her name, and that perfunctorily and with great effort. That by reason of said illiteracy the said Mrs. Walsh was utterly unable to either compose the document or to understand the meaning of the words in which it was couched; that she was unable to copy said document, even if written and prepared for her by some third person.

The relationship of the interveners was put at issue by the universal legatees, but on the trial the judge found that they had established their kinship, and were the nearest surviving relations to the decedent, being half-blood nieces and nephews, and entitled to the estate in the event the will was found to be invalid.

A great mass of conflicting testimony has been brought up in the record, most of which bears on the heirship of the interveners, and volumes of which relate to matters utterly irrelevant and foreign to any possible pertinent issue in the case. We have had to undergo the painful task of searching out and collating from the several large volumes of the transcript that part of the evidence pertaining to or affecting the live or remaining issue in the case.

The sole question presented in this appeal is whether or not the document presented for probate, and probated, is the last will and testament of Mrs. Walsh, was entirely written, dated, and signed in her handwriting, and this necessarily involves the question as to whether she could write and sign her name, and whether she was physically able to do so at the time the alleged will is said to have been written.

The charge that the decedent was mentally incapacitated from making a will, whether superinduced by the infirmities of age, or from disease, as also the charge that the testatrix was so blind that she could not see how to write, seem to have been abandoned, as they are not referred to in counsel's brief. But, be that as it may, the evidence does not support such charges, but, on the contrary, establishes that Mrs. Walsh was of sound mind and knew precisely what disposition she desired to make of her property. She so expressed herself at the time, and had told several people prior thereto what she contemplated doing.

She had suffered with cataracts formed in the eyes, but she had, at and before the making of the will, been relieved of the impediment to her eyesight.

There is little or no controversy about the law governing the case. An olographic testament is subject to no other form than that it must be entirely written, dated, and signed by the hand of the testator. C. C. 1588.

Counsel for the interveners quote from various French commentators, in which it is contended that the writing of the will must be the exclusive work of the hand of the testator, unassisted by the holding of the hand by a third party.

Thus Merlin, Repertoire De Jurisprudence, 34 Tes-Tra, p. 126, states:

"I said in the preceding number that, for the mixing of a foreign signature with that of the testator to carry nullity of the olographic will, it is necessary that the testator have put his hands to it (the signature), or, at least, that he have knowledge of the same; otherwise, in fact, as has well said Mr. Toulien (book 3, title 2, chapter 5, No. 358):

" 'It would be in the power of a third party in whose hands the will might have fallen, to annul it by writing interlineations therein.' "

Laurent, Droit Civil Francais, 13, p. 192:

"But, if the third party has acted in the right and with the knowledge of the testator, it must be decided according to the vigor of right that the testament is null. In fact it is the essence of an olographic will that it be entirely written, dated, and signed by the hand of the testator; that is to say, that it be his work exclusively; as soon as the hand of a third party is shown, it is vitiated; that is the text and spirit of the law. The Court of Bourges has thus judged it. There were in the testament attacked, commas, accents, two S's and six indications of references which were not in the hand of the testatrix; hence the writing was not entirely in her hand, which nullified it."

"It was opposed that the corrections made by the third party added nothing to the dispositions. Nevertheless, said the decree, it is none the less true that the interpolations having been made with the consent of the testatrix, a third party cooperated to the writing of the testament, which vitiated it and rendered it null."

And from Duranton, Cours De Droit Francais, p. 27:

"The testament must be written entirely by the hand of the testator; so that a single word in a foreign hand would vitiate the whole, even though that word were superfluous for it would be true to say that the testament has not been written entirely in the hand of the testator, as the law requires; that word, therefore, would vitiate not only the clause or the disposition in which it occurred, but the act in its entirety."

"However, an addition not approved by the testator would not operate to this effect, this is ordinarily; otherwise the annulment would depend on the one in whose hands the will would fall, or the one to whom the will would be delivered for motive or other."

We find nothing in the authorities quoted that differ in any material respect from the requirements of our Civil Code and our jurisprudence.

Nor do we find any expression that meets the situation presented in this case. The authorities quoted plainly have reference to cases where different portions of the will are written by different persons, such as in interlineations or the interpolation of words, or matters of punctuation. A will so written would not be a valid will under our law, any more than under the French law. Such a will would not be the exclusive work of the testator.

■ We are therefore in strict accord with the French commentators when they say that an olographic will, which is not entirely written, dated, and signed by the testator, but which contains matters written in a foreign hand or a hand other than of the testator, is not the exclusive work of the testator, and is therefore null and void.

But we have no such case here.

■ The document presented as the will of Mrs. Walsh is an exact reproduction of a will written on April 14, 1924, in the presence of Father Dillon, Miss Alice O'Connor, and Hugh O'Brien, and who signed the will as witnesses.

It is not pretended that the will probated was written in a different hand or by a different person from the one of April 14th. Indeed, the evidence conclusively shows that both wills were the handwriting of the same person.

So that, if the earlier will was written by Mrs. Walsh, the last one was also.

The contention is that one O'Brien not only held the hand of Mrs. Walsh, but that he controlled its every movement and directed the pen which made the letters, thereby making the writing of the will the work of O'Brien, and not that of the testatrix.

If this were true as a matter of fact, then there would be no valid will.

But the district judge found the truth to be otherwise.

His opinion is so clear and logical that we have concluded to insert here the greater portion of it:

"There is an unanimity of opinion that the will of the 16th and the one of the 14th were

written by the same person. In fact, these two documents are identical. The two handwriting experts agree on this fact, and so do all the witnesses. Therefore, if it is found that the will of the 14th was written by the decedent, it must follow as an inevitable conclusion that the will of the 16th is also the work of her hand.

"The testimony of Father Dillon and Miss Alice O'Connor, both of whom were present when the will of the 14th was written, is conclusive. These disinterested reputable witnesses, despite the rigid cross-examination to which they were subjected, testified clearly and unequivocally that Mrs. Walsh wrote the will herself, copying the words of the will from a document on the table in front of her, and that Hugh O'Brien merely at her request steadied her wrist or hand. They further testified that the decedent could see, that she knew and understood perfectly what she was doing, that she had requested them to be present as witnesses, and had previously informed them that she would provide for the O'Brien girls. After the will was completed, that she was grateful to God for having finished it, and in no uncertain language said so.

"The attackers of the will contend that Hugh O'Brien did not merely steady the decedent's hand on this occasion (April 14), but that he, using the pen held in decedent's hand, actually wrote the will. Both of the witnesses, Father Dillon and Miss O'Connor, positively deny this. Hugh O'Brien, the brother of the two legatees, corroborated the two disinterested witnesses. He stated that the decedent was nervous, and after commencing to write, as her hand was trembling, she requested him to steady her hand or arm, which he did by holding her wrist; that he had absolutely nothing to do with the formation of the letters or the expression of ideas contained in the will. The court believes this to be true, not because Hugh O'Brien said so, but because the other two witnesses said so, and because the handwriting in that particular document itself proves it. It is positively not the handwriting of Hugh O'Brien. I will state my reasons in a moment for saying this. The objectors to the will contend that it is their belief that Hugh O'Brien was the writer of the will of the 14th, and as everybody admits the same person who wrote the will of the 14th also wrote the one of the 16th, they argue therefore that Hugh O'Brien wrote the will of the 16th. Exactly the same syllogistical reasoning by which the court is convinced that decedent wrote the will of the 16th, because it feels certain that decedent, and not Hugh O'Brien, wrote the one of the 14th.

"I will now state my reasons why, from an examination of the documents of the 14th and 16th, I am convinced that Hugh O'Brien did not write them, but that the decedent did. There is present throughout the entire document the 'tremor of age,' which it would be impossible for Hugh O'Brien to imitate. Professor Spencer, an eminent handwriting expert, failed miserably when he attempted to do it. Again the handwriting in the wills bears little, if any, resemblance to the handwriting of Hugh O'Brien, while to the untrained eye of the court it is identically the same as decedent's handwriting, when compared with her admittedly genuine signature to numerous documents.

"Mr. Walsh, the husband and plaintiff, concerning whom the court feels it but just to say that he appeared incapable of telling a falsehood, whether his testimony was favorable or unfavorable to himself throughout the protracted trial, in the opinion of the court, he told the truth on each and every occasion as he knew it. This old gentleman, when shown the two wills, frankly admitted that the handwriting in them looked very much like his wife's handwriting.

"In paying the foregoing deserved tribute to the honesty and fairness of Mr. Walsh, it must not be construed to mean that the court believes that every bit of Mr. Walsh's testimony was as a fact true; on the contrary, where his testimony conflicts with Father Dillon's as to what Father Dillon told him about Hugh O'Brien holding the decedent's hand, the court believes Mr. Walsh to be mistaken, and is convinced that Father Dillon's testimony is both morally and materially true. Counsel for Mr. Walsh laid great emphasis on this conflict, stating in his argument that there could be no explanation offered. The explanation appears to the court very simple. Mr. Walsh is old, very deaf, and was, when the interview took place between himself and Father Dillon, in a very excited condition of mind; it is possible he may have under these circumstances misunderstood what Father Dillon said, or, 'the wish being father to the thought,' he may have believed that Father Dillon said, what he wanted Father Dillon to say, to wit, 'that Hugh O'Brien held his wife's hand.' This particular conflict makes little difference, because Father Dillon has testified that Hugh O'Brien did steady the decedent's hand, but he denies that he ever mentioned this fact to Mr. Walsh prior to this suit being filed, and the court believes Father Dillon.

"Again, Mr. Spencer, a recognized handwriting expert, testified positively that, after an exhaustive comparison of these wills with the admittedly genuine signature of Mrs. Walsh, the decedent, they were entirely written, dated, and

signed by the same person who had written the admittedly and proven genuine signatures of Mrs. Walsh.

"Despite the exceptionally clever traps laid by ingenious counsel of Mr. Walsh to discredit Mr. Spencer's ability to pick out genuine signatures of Mrs. Walsh, by showing him her name indorsed on back of checks, which name had been written by some other person, not once did Professor Spencer err in distinguishing her handwriting from the handwriting of others.

"By comparing the wills with the handwriting of Hugh O'Brien, although not knowing whose handwriting it was, he pointed out many reasons why, in his opinion, that the person whose handwriting he was then examining could not have written the wills.

"In addition to all the other reasons previously mentioned, there is another, and to this court a most convincing one, why plaintiff and interveners' contention is incorrect, to wit, that Hugh O'Brien actually wrote the wills, using Mrs. Walsh's hand as an instrument with which to write. It is this: The court believes that it would be impossible to write by holding another person's hand and do so through four or five lines in a fixed or characteristic style; that it would be impossible to so guide the pen through the other's hand as not to make long, uneven, irregular strokes and angles, and to demonstrate the correctness of this theory the court requested counsel for Mr. Walsh during the argument to try to guide his associate's hand; in other words, to do exactly what he contended Hugh O'Brien did with Mrs. Walsh's hand; and, although the learned counsel held his associate's fingers very close to the pen, 'not the wrist, as the evidence shows,' the experiment justified the court's theory.

"There is no dispute concerning the fact that Mrs. Walsh desired to leave her property to the two O'Brien girls; the evidence of disinterested witnesses proves this beyond doubt; and the evidence shows another fact to be true. Mrs. Walsh, whether with or without reasons, was not confidential with her husband, and appears to have been distrustful of him.

"The decedent had reared these two girls, the daughters of her first cousin, Matt O'Brien; they had lived with her for many years; in fact, she was the only mother they had ever known; they called her 'Aunt,' and she usually referred to them as her nieces. Therefore the making of the will, leaving them her property, certainly was not such an unexpected act as to cast upon it suspicion; this is especially true when the evidence shows that her husband had at least $8,000 of his admittedly separate property. Are we traveling out of the record in imputing to this decedent the belief that these girls would care for her aged husband as long as he lived? He had always treated them as his own children; they knew him by no other name than 'Uncle Johnny,' and it is reasonable to believe that Mrs. Walsh felt that, by leaving her property to these foster daughters of both her husband and herself, she was doing the wise and prudent thing. She was at once assuring her husband's comfort in his declining years, and yet putting it beyond his power to favor his own relatives, to the detriment of the girls she had reared from babyhood."

We find it unnecessary to add anything to the foregoing opinion, as it answers completely the contention that the will was written by a person other than the testatrix, and is fully sustained by the evidence in the record.

The judgment appealed from is therefore affirmed, at the cost of appellants.